UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NEUROS CO., LTD and AVIATION AND POWER GROUP, INC. d/b/a APG-NEUROS, INC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| KTURBO INC., | ) ) |
| Defendant. | ) ) |

Case No. 08-cv-5939

Judge John W. Darrah

## <u>MEMORANDUM OPINION AND ORDER</u>

This case arises from a dispute between two manufacturers of high-speed, direct-drive turbo blowers used in Waste Water Treatment Plants ("WWTPs"). Neuros Co., Ltd ("Neuros") is a Korean corporation with its principal place of business in Korea. Aviation and Power Group, Inc. ("APG") is a Canadian corporation with its principal place of business in Quebec. Neuros and APG formed a joint venture (hereinafter, "APG-Neuros") to market and sell Neuros-branded turbo blowers in the North American market. KTurbo Inc. ("KTurbo") is a Korean corporation with a principal place of business in Batavia, Illinois.

After KTurbo lost a bid to APG-Neuros on a WWTP project in South Valley, Utah, KTurbo's CEO, HeonSeok Lee, accused APG-Neuros of cheating during the bid process by submitting false data for its turbo blowers. On October 16, 2008, APG-Neuros filed this six-count action against KTurbo. APG-Neuros asserts claims for false and misleading statements in violation of the Lanham Act; violation of Illinois'

Uniform Deceptive Trade Practices Act ("DTPA"), codified at 815 ILCS 510/1 *et seq.*; defamation *per se* and defamation *per quod*; common-law trade libel/false light/business disparagement; and intentional interference with prospective economic relations. All claims are based on KTurbo's statements regarding APG-Neuros's bid on the South Valley project.

On December 8, 2008, KTurbo filed counterclaims, which were amended on December 17, 2008. KTurbo generally alleges that APG-Neuros made false statements about APG-Neuros's products, KTurbo's products, and KTurbo's financial situation to secure a competitive advantage in the WWTP bidding process. Like APG-Neuros, KTurbo also asserts claims under the Lanham Act; the DTPA; and the common law of defamation *per se*, defamation *per quod*, trade libel/false light/business disparagement, and intentional interference with prospective economic relations. KTurbo also asserts one count under the Illinois' Consumer Fraud and Deceptive Business Practices Act ("ICFA"), codified at 815 ILCS 505/1 *et seq.*

A bench trial was held from October 18, 2010, through October 22, 2010. The trial included the testimony of several witnesses (including expert witnesses) and the admission of various exhibits into evidence. Both parties have also submitted designated portions of a number of depositions, written closing arguments, written responses to those arguments, and proposed findings of fact and conclusions of law.

The Court has considered the evidence, including the testimony of the witnesses and exhibits, and has further considered the written submissions of counsel for the parties and the authority cited therein. The Court weighed the testimony of each witness and

determined whether the testimony was truthful and accurate (in part, in whole, or not at all) and decided what weight, if any, to give to the testimony of each witness. In making this determination, the Court considered, among other things: the ability and opportunity of the witness to see, hear, or know the things about which the witness testified; the witness's memory; any interest, bias, or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all of the evidence in the case. *See* Fed. Civ. Jury Instr. 7th Cir. § 1.13 (2009).

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all of the admissible evidence and this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact. The Decision section of this Opinion and Order, for purposes of organization and clarity, contains some reference to law and facts. To the extent, if any, that any part of the Decision may be considered Findings of Fact or Conclusions of Law, it shall be so deemed.

## FINDINGS OF FACT

APG-Neuros and KTurbo compete in the North American market for high-speed turbo blowers used in WWTPs. Turbo blowers have revolutionized the WWTP industry, and municipal WWTP agencies around the country are replacing their larger positive-

displacement motors with compact turbo blowers that operate with greater efficiency and flow rate than traditional blowers. The aerodynamic efficiency of turbo blowers is a point of competition among manufacturers because greater efficiency translates to lower energy requirements and, consequently, lower operating costs. In 2006, APG-Neuros was the first turbo-blower manufacturer to enter the North American WWTP market. KTurbo entered the North American market in 2008.

WWTP projects are managed by consulting engineers hired by WWTP owners. The engineers design plants, draft requests for proposals, exchange information with qualified bidders, evaluate bid submissions, confirm blower performance, and oversee installation. They also develop project specifications, which vary from project to project. Examples of project specifications include necessary certifications, impeller type, delivery schedule, the number of existing installations, product support, component-manufacturer limitations, pre-qualification, blower noise levels, performance guarantees, flow-rate or power-draw tolerances, and testing requirements.

A typical document submitted in a bid for a WWTP project would require the bidder to disclose the "power draw" (also referred to as "kilowatt draw" or "wire power") for various operating points. Manufacturers typically do not guarantee the total efficiency of their blowers, though total efficiency can be derived from the power draw, specified operating conditions, and a number of assumptions about a blower's operation. Power-draw guarantees and specification compliance are often confirmed through tests conducted before the manufacturer ships the blower to the customer.

4

*The WWTP Projects at Issue in This Suit*

There are a number of WWTP projects at issue in this suit, including projects for the King County Wastewater Treatment Division in King County, Washington; the South Valley Sewer District in South Valley, Utah; a municipal utilities agency in Bowling Green, Kentucky; the Napa Sanitation District in Napa Valley, California; the Knoxville Utility Board in Tennessee; the Ironhouse Sanitary District in California; and the Timpanogos Special Services District in Utah.

<u>King County</u>

In 2007, the King County Wastewater Treatment Division was interested in using turbo blowers for a new, large WWTP. Turbo blowers were new to the American market at the time, and King County wanted additional performance data and information about APG-Neuros's blowers. Accordingly, in September 2007, Darren Edwards, an engineer employed by CH2M Hill, the consulting-engineering firm on the King County project, visited the Neuros factory in South Korea on behalf of King County to witness a factory core test of a Neuros NX300 C070 model blower and to observe its performance. A functional test of a Neuros NX300 C060 in its package was also conducted.[1] After the tests, in October 2007, CH2M Hill presented a written report to King County. The only performance data in the CH2M Hill report comes from the core test, which is reported to have been "performed per ASME PTC10 requirements." PX31. The PTC-10

---

[1] A "core test," as that term is used by APG-Neuros, involves measuring the performance of a blower unit that has been removed from the casing or package in which it will be installed and operated in a particular application. A "functional" or "package" test would involve testing a particular blower as it would be housed and configured for use in a particular application.

5

(Performance Test Code-10) standard is an industry specification, or protocol, developed by the American Society of Mechanical Engineers (ASME). It is used to test equipment, including blowers, though it predates the high-speed, direct-drive turbo blowers manufactured by APG-Neuros and KTurbo. In or about June 2008, the King County Wastewater Treatment Division sought to purchase two turbo blowers for an existing WWTP known as the South Treatment Plant. The project was awarded to APG-Neuros in July 2008 after King County obtained a sole-source waiver that allowed the purchase of blowers without a public bidding process.

South Valley

In May 2008, APG-Neuros and KTurbo both submitted bids to supply thirteen turbo blowers for the South Valley Sanitary District WWTP in South Valley, Utah, as did a third manufacturer, ABS. Each bidder was required to guarantee power draws for thirty different operating points and conditions. Bidders were not required to guarantee the total efficiency of their blowers, and APG-Neuros did not do so. The South Valley project's consulting engineers, Bowen, Collins, & Associates, Inc. ("Bowen Collins"), evaluated the bids using a point system of seven weighted criteria with a maximum possible score of 135. APG-Neuros came in first with 128.8 points; ABS came in second with 120.7 points; and KTurbo came in third with 108.4 points. The largest point spread between APG-Neuros and KTurbo was in the area of "Product Support," which includes factors such as North American offices, staff, field services, training, local engineering networks, local service centers, and twenty-four-hour service. KTurbo received 15 out of 25 points, compared to APG-Neuros's 25. KTurbo was not yet fully established in the

United States market at the time. The contract for the South Valley project was awarded to APG-Neuros.

On June 19, 2008, KTurbo's CEO, HeonSeok Lee, received a copy of the aforementioned CH2M Hill report from one of KTurbo's sales representatives. Shortly thereafter, KTurbo also obtained a copy of the bid APG-Neuros submitted on the South Valley project.

On July 7, 2008, KTurbo's marketing manager, Trinity Lee, sent an email to Dennis Livingston, who is associated with an original-equipment manager with whom KTurbo wanted to do business. The stated purpose of the email was to "give some information on how Neuros is providing false efficiency data when they bid." PX70. Trinity Lee is HeonSeok Lee's sister, and she sent the email at his direction. Several documents were attached to the email. One attachment, a PowerPoint presentation created by HeonSeok Lee, stated that APG-Neuros's efficiency guarantees to South Valley constituted a "crime" and "cheating." A second PowerPoint slide, also prepared by Lee, states that APG-Neuros's "guaranteed" efficiency of 82.2% is a "crime" and that the "world [*sic*] best total efficiency is 72%." Also attached were the CH2M Hill report and a page from APG-Neuros's bid on the South Valley project.

Lee arrived at the calculations in his PowerPoint slides by manipulating some of the data from APG-Neuros's South Valley bid submission. APG-Neuros's bid submission states that its power-draw guarantees were based on an inlet pressure of 12.6 psia (pounds per square inch absolute). When Lee calculated what he contended to be efficiency ratings that corresponded to APG-Neuros's performance guarantees,

however, he assumed an inlet pressure of 12.4 psia. At trial, Lee admitted that this manipulation increased his efficiency calculations by six percentage points. Lee also manipulated the data he derived from the CH2M Hill report. The CH2M Hill report states that one of APG-Neuros's blowers operates at 74% efficiency at a given operating point. Lee calculated what he believed to be a "corrected" efficiency of 63%-65%. In order to arrive at that number, he raised the assumed discharge temperature and lowered the assumed discharge pressure from what was stated in the CH2M Hill report.

On July 14, 2008, an assistant manager in KTurbo's sales department sent an email to a group of 73 individuals. The recipients consisted primarily of KTurbo's sales representatives, although some recipients had not entered into written contracts with KTurbo. The subject line of the email reads, "The issue with cheating of Neuros," and the body of the email is as follows:

> Dear Sirs,
>
> I'm just writing to inform you that Neuros which is one of turbo blower maker in South Korea guanteed [*sic*] 82.2% total efficiency in South Valley Project, but it was NOT truth and a crime to win the bid for the project. I attached the cheating data and all evidence relevant to this cheating data.
>
> We posted writing regarding the cheating of neuros on the public notice of our salesnet and uploaded all evidence relevant to this cheating data. Please check the data and writings.
>
> It would be appreciated if you leave your opinion on our salesnet or send e-mail regarding the issue with cheating of neuros.
>
> Public notice bulletin board's link: http://sales.kturbo.com/
>
> Please let me know if you need more information.

PX31. Ten documents were attached (including Lee's PowerPoint slides and the rest of the attachments from the July 7 email).[2]

After receiving the July 14 email, two of the recipients, including Livingston, expressly advised Lee against accusing APG-Neuros of cheating.

On July 29 and 30, 2008, KTurbo held an inaugural meeting at its United States headquarters with a number of KTurbo's sales representatives. Lee's PowerPoint slides about APG-Neuros's purported cheating were presented at the meeting. In preparation for the meting, Lee also posted his presentations on a publicly accessible portion of KTurbo's Korean-language website.

### Napa Valley

In April 2008, the Napa Sanitation District in Napa County, California, sought bids from turbo-blower suppliers to replace two blowers in an existing WWTP, and the contract was awarded to APG-Neuros. Prior to APG-Neuros's shipping the blowers, and to confirm the power-draw guarantees made during the bid process, Napa required a factory witness test performed at Neuros's Korean test facility in the presence of Gregory Harris, the consulting engineer overseeing the project for the Napa Sanitation District. In July 2008, Lee sent an email to Vic Miolee at United Blower, Inc., a representative of KTurbo, regarding the scheduled testing for the Napa project. Lee asked Miolee to speak with Harris and explain Lee's claims of APG-Neuros's "cheating" before Harris witnessed the testing for the Napa project. Lee wrote, "If Gregory [Harris]

---

[2] Lee testified that the documents attached to the July 14 email may have been modified somewhat from those that were attached to his July 7 email but that they were almost the same. Trial Tr. 62-63.

helps, this is ABSOLUTELY GREAT CHANCE of breaking Neuros." PX 46. Lee then met with Harris and discussed his PowerPoint presentations regarding APG-Neuros's purported "cheating."

In September 2008, Harris visited the Neuros facility and witnessed a factory core test of an NX300-C080 blower manufactured for the Napa project. A functional package test of the core in the enclosure was also conducted. Following the tests, APG-Neuros prepared three associated test reports at the customer's request: "Witness Test of NX300-C080," "PTC-10 Performance Test of NX300-080 Core," and "Package Performance Test of NX300-080." Harris was satisfied with the reports and believed that APG-Neuros met its performance guarantees for the Napa project.

<u>Bowling Green</u>

In October 2008, APG-Neuros bid on a project in Bowling Green, Kentucky. Although KTurbo also prepared a bid on that project, no evidence was presented to show that KTurbo's bid was actually submitted. (APG-Neuros contends it was not.) Neither APG-Neuros nor KTurbo was awarded the contract. Notwithstanding the fact that KTurbo's counterclaims are based almost entirely on allegations of statements made in connection with the Bowling Green project, KTurbo presented no persuasive evidence regarding this project.

After receiving a cease-and-desist letter from APG-Neuros in August 2008 and after the initiation of this lawsuit in October 2008, Lee continued to communicate with persons in the WWTP industry (including consulting engineers) and to accuse APG-Neuros of "cheating" and committing a "crime." He did so through correspondence

and through in-person meetings. As late as October 25, 2009, Lee wrote to a large group of "KTurbo partners and supporters," asserted that APG-Neuros's blowers waste 15% more energy than they were claiming, and discussed his plan to "terminate Neuros completely." *See* PX66.

Post-Counterclaim WWTP Projects

KTurbo introduced evidence regarding issues based on three additional WWTP projects that arose well after the Complaint and counterclaims were filed and answered. The first is a project by the Knoxville Utility Board ("KUB") for which both APG-Neuros and KTurbo submitted bids. On February 18, 2009, Stephen King, an engineer with the consulting firm of CDM sent an email to Joshua Johnson at KUB. *See* DX92. Attached were several documents that listed comparisons of APG-Neuros's and KTurbo's blowers. Although he did not draft them, APG's CEO, Omar Hammoud, testified that he provided some of the information used to create those documents.

The second recently disclosed project is for the Ironhouse Sanitary District in California. On March 20, 2009, in connection with a bid, Hammoud sent an email to Jenny Skrel, an Ironhouse representative. *See* DX80. Hammoud attached the comparison documents from the KUB correspondence to his email to Skrel.

The third newly disclosed project is for the Timpanogos Special Services District in Utah. Both APG-Neuros and KTurbo submitted bids in March 2009. The bid was awarded to KTurbo.

The documents submitted in connection with the KUB and Ironhouse projects list a number of purported advantages APG-Neuros and its blowers have over KTurbo and its

11

blowers. Among other things, the documents state that KTurbo's cast impeller is inferior to APG-Neuros's machined impeller, that KTurbo's blower performance has never been confirmed by witness testing or accepted by United States customers, that KTurbo's blowers do not have Underwriters Laboratories certification, that KTurbo uses poor-quality controllers, and that KTurbo has had to recall products due to quality problems.

Hammoud also sent correspondence regarding KTurbo's financial situation in connection with the Ironhouse and Timpanogos projects. In a March 30, 2009 email to Skrel, *see* DX79, and a March 25, 2009 letter to Larry Bowen, the engineer for the Timpanogos project, *see* DX24, Hammoud represented that KTurbo's financial situation was poor. Hammoud stated that KTurbo's "very bad cash situation" would "prevent KTurbo from being able to develop the product and provide local support, let alone being able to establish business operations in North America"; that "with their price discounting, KTurbo [*sic*] debt to sales ratio will worsen to the point that KTurbo may not be able to support the interest expense"; and that "KTurbo's practice of reckless pricing tactics has weakened their financial capability."

The statements made in those two letters are based on a publicly available financial report from the Korean Information Service, Inc. (the "KIS report"). Neuros obtained the report in Korea, and Hammoud attached it to the aforementioned correspondence with Skrel and Bowen. The KIS report stated that KTurbo's cash-flow status was "Unsatisfactory" because "[t]he annual cash flow is inferior to the average and not enough to cover working capital." DX83. The report also states that KTurbo's ratio

of "debt to sales is 109.37%, which falls into the bottom 30% of all the companies (bad) and the bottom 15% of the industry peers (vary [*sic*] bad)." *Id.*

*Expert Testimony*

KTurbo presented the testimony of Dr. David Japikse at trial. Dr. Japikse was qualified to testify as an expert in the field of turbo engineering. Dr. Japikse never actually tested a Neuros blower. Instead, he reviewed the CH2M Hill report and the Napa reports and opined that APG-Neuros's testing methods did not comply with the PTC-10 standard. After identifying a number of PTC-10 provisions with which he opined that APG-Neuros failed to comply, Dr. Japikse ultimately concluded that Neuros's testing procedures resulted in an overstatement of efficiency and flow rate by 2-7%. His opinion was specifically based on perceived deficiencies with Neuros's in-package (or functional) testing. At trial, Dr. Japikse acknowledged that the CH2M Hill report does not indicate that Neuros's functional test was PTC-10 compliant, only that its core test was.

The Court also heard expert testimony from Nicholas D'Orsi, who is found to be qualified in the field of aerodynamic engineering, having been employed in that field for twenty-two years. Although D'Orsi was retained by APG-Neuros, it was KTurbo who initially offered his testimony at trial. KTurbo's counsel read portions of D'Orsi's deposition into the record. Later, D'Orsi was called to testify by APG-Neuros. D'Orsi reviewed the CH2M Hill and Napa reports and noted that none of the operative reports he reviewed contained any representation that Neuros's in-package testing was PTC-10 compliant. Regarding the core test, D'Orsi opined that Neuros's test was not fully

compliant but that any deviations from the PTC-10 standard were minor and that flow rate and efficiency were accurately measured and calculated. D'Orsi also opined that the PTC-10 standard does not require testing of a blower to be done in the package in which it will be installed at a facility. D'Orsi ultimately concluded that the efficiency of Neuros's blower would be reduced to 68-70% when the blower is placed in its package.

Dr. Kicheol Park testified as both a fact witness and as an expert witness for APG-Neuros. Dr. Park is APG's Chief Operating Officer and a shareholder and director of Neuros. Dr. Park prepared the performance portion of APG-Neuros's bid on the South Valley project and supplied the guaranteed-wire-power data. He testified that APG-Neuros confirmed its guaranteed wire-power figures through a core test at its factory and that APG-Neuros made no representations on the bid submission form as to guaranteed efficiency.

Dr. Park's background is in aerospace engineering, and he has some experience in blower design. He testified that he has conducted tests with reference to the PTC-10 standard, though he has more experience in Korean and Japanese standards. He read the PTC-10 code and worked with it during the two years preceding this trial. He has tested Neuros's machines to verify power guarantees on a regular basis. Dr. Park is qualified as an expert to testify in the area of aerospace engineering and, to a more limited extent, in the specific area of PTC-10 compliance. Dr. Park opined that each of KTurbo's specific accusations of cheating was false. He noted that APG-Neuros never claimed the efficiencies Lee accused it of claiming and ultimately concluded that placing a blower in its package reduces efficiency by 2-3 percentage points compared to the core test.

14

However, Dr. Park's actual expertise regarding the PTC-10 code is less than that of D'Orsi and Dr. Japikse; moreover, the factual basis of his opinions and the methodology used in forming them were not always clearly stated. Also, Dr. Park is a shareholder, director, and officer of APG or Neuros and, therefore, has a direct interest in these proceedings. Consideration of these factors diminishes the weight attributed to Dr. Park's expert opinions.

### Falsity of KTurbo's Statements

As discussed in the Conclusions of Law below, each of APG-Neuros's claims against KTurbo depends on APG-Neuros's ability to prove that KTurbo made a false statement about APG-Neuros or its turbo blowers. In a number of communications directed to third parties, KTurbo accused APG-Neuros of "cheating" and committing a "crime" by overstating the efficiency of its blowers in its successful bid on the South Valley project. KTurbo's statements were literally false.

There is no evidence that APG-Neuros made *any* guaranteed efficiency ratings in its bid for the South Valley project. The efficiency data from the CH2M Hill report stated that total efficiency for *one* blower at *one* operating point was 74% according to a *core* test. But there is no evidence that this statement in the CH2M Hill report – created by a third-party engineering firm for a specific project – is attributable to APG-Neuros or that APG-Neuros adopted that figure as its own and used it to market its products. APG's CEO, Hammoud, merely testified that he provided a portion of that report (the "annex") in connection with the South Valley project and that he labeled it "preliminary." Trial Tr. 383. Furthermore, there is no evidence that South Valley relied on the

15

efficiency representations in that third-party report in selecting APG-Neuros for the project.

The bid sheet submitted by APG-Neuros did not include any guaranteed-efficiency data. Instead, per South Valley's bid instructions, APG-Neuros provided "Guaranteed Wire Power," expressed in kilowatts. The extent to which "efficiency" corresponds with "Guaranteed Wire Power" was not made clear at trial.[3] At one point during the trial, Lee characterized efficiency as "power consumption in an ideal case or ideal machine divided by actual consumption of power." Trial Tr. 643. At another point, he stated, "[K]ilowatt and efficiency is intricately related. Kilowatt equals efficiency multiplied by a certain percentage." Trial Tr. 36. Dr. Japikse testified that wire power "is a fundamental part of the efficiency calculation," which also takes into account inlet temperature and pressure, humidity, and flow rate. Trial Tr. 549-50. Ultimately, KTurbo did not prove at trial that a prospective purchaser could easily determine efficiency data from wire-power data.

Moreover, Lee acknowledged that the figures he claimed as APG-Neuros's efficiency representations were based on his own calculations, which have not been consistent. At various times, Lee has asserted that APG-Neuros was claiming efficiency of anywhere from 74% to 82.5%. At trial, Lee admitted that his initial figure of 82%, as communicated in KTurbo's July 14 email, was a mistake.

---

[3] In post-trial briefs, KTurbo asserts that "APG-Neuros represented that its NX300-C070 blower model could achieve guaranteed wire power that *corresponded* to an overall efficiency rate approaching 80%." *See* KTurbo's Resp. to Pls.' Post-Trial Br. 1 (emphasis added).

The expert testimony presented at trial does not rebut the evidence showing that KTurbo's statements about APG-Neuros's turbo blowers are false. Dr. Japikse's opinion focused on his belief that APG-Neuros's testing, as reported in the CH2M Hill and Napa reports, failed to comply with at least sixteen required provisions in the PTC-10 standard. However, none of Lee's statements regarding APG-Neuros's "cheating" addressed PTC-10 compliance; and there is no evidence that APG-Neuros represented PTC-10 compliance in its bid for the South Valley project. At trial, Lee merely testified that he knew "by hearing" that APG-Neuros claimed its performance test was PTC-10 compliant. Trial Tr. 638. Plaintiffs objected to that testimony as inadmissible hearsay, and the objection was sustained. Trial Tr. 638-41.

KTurbo also gives emphasis to the PTC-10 standard by arguing that the CH2M Hill report represented that APG-Neuros used the PTC-10 standard to test its blowers and that APG-Neuros used the report in bidding on the South Valley project. As discussed above, however, there is insufficient evidence to show that APG-Neuros used that third-party report as a representation that its testing complied with PTC-10. Moreover, the CH2M Hill report merely states that the *core* performance test was performed per PTC-10 requirements. D'Orsi testified that any deviations from PTC-10 were minimal, and KTurbo's expert did not rebut that opinion. Instead, KTurbo focused on whether the *in-package* testing reported by CH2M Hill complied with the PTC-10 standard. There is no evidence that APG-Neuros represented that its in-package testing – the results of which KTurbo claim to be false – fully complied with the PTC-10 standard.

17

Moreover, Lee has accused APG-Neuros of overstating its efficiency ratings by as much as 15% based on Lee's interpretations of the CH2M Hill and Napa reports. *See* PX66.[4] None of the experts who testified at trial provided an opinion that would support Lee's assertions as to this degree of APG-Neuros's purported overstatements.

*Falsity of APG-Neuros's Statements*

Each of KTurbo's counterclaims is also based on alleged false statements by APG-Neuros, specifically: (1) statements about the performance of APG-Neuros's blowers, (2) statements about the quality of KTurbo's goods and services, and (3) statements about KTurbo's financial viability.

Regarding APG-Neuros's statements about its own blowers, KTurbo again relies on Dr. Japikse's opinion that placing the core from the Napa test in its package would reduce the blower efficiency by 2-7%. Again, there is no persuasive evidence that APG-Neuros represented that any performance data was derived from in-package testing or that any significant inaccuracies existed as to core testing. Also, KTurbo has not identified any evidence that APG-Neuros represented its in-package testing to be PTC-10 compliant.

---

[4] In its post-trial materials, APG-Neuros asserts that Lee accused APG-Neuros of cheating by 25, 26, and even 30% at various times. That argument lacks sufficient evidentiary support. APG-Neuros asserts that KTurbo made these claims in several PowerPoint presentations created by Lee. At trial, Lee acknowledged creating a document that included a statement that APG-Neuros overstated efficiencies by 26% and that he used that document in connection with presentations to engineers, but Lee never testified as to whether that particular page (out of the 144-page exhibit) was ever published to anyone. *See* Trial Tr. 113-14 (discussing PX157). Other exhibits APG-Neuros cites in support of its position that Lee accused APG-Neuros of cheating by up to 30% were admitted into evidence by stipulation without any foundation that would allow the Court to discern whether these statements were published to anyone, much less who received them and when.

Regarding KTurbo's claims that APG-Neuros made false and misleading statements of fact about KTurbo's products, KTurbo failed to prove that any of the statements contained in the documents submitted in connection with the KUB and Ironhouse projects were false. No evidence as to the truth or falsity of those statements was presented at trial. Instead, KTurbo's support for this claim comes almost entirely from the deposition testimony of Miolee, who is a sales marketing manager for United Blower, a company that was a master North American sales representative for KTurbo. For the most part, Miolee simply states that he disagrees with some of the statements presented in one of those documents (DX80). For example, with respect to statements about KTurbo's poor-quality Korean controllers and its inability to meet the schedule for the KUB project, Miolee said, "I'm not saying that some of that might not be true." Miolee Dep. at 84. With respect to the statement that KTurbo over-discounts its projects to overcome product inefficiencies and poor quality, Miolee said, "I don't believe that CDM in writing put something like this down, even if it is true." *Id.* at 86-87. With respect to statements about KTurbo's paying penalties for product recalls, Miolee said, "It could be true. I certainly have been told about China." *Id.* at 88-89. At any rate, Miolee was not tendered nor qualified as an expert; and KTurbo provided no other proper foundation for his testimony.

Regarding KTurbo's claims that APG-Neuros made false statements about KTurbo's cash situation, KTurbo failed to establish that the statements contained in the documents submitted in connection with the Ironhouse and Timpanogos projects are false. Hammoud attached the KIS report to his correspondence, and his comments were

clearly based upon the information he obtained from the report. KTurbo has not shown that those statements are false or that it was reckless for Hammoud to make statements based on the information he obtained from those reports. At trial, Lee even admitted saying in March 2009 that KTurbo's financial condition was "not so good" because KTurbo "used too much R&D expenses." Trial Tr. 690.

## CONCLUSIONS OF LAW

### Jurisdiction

The Court has jurisdiction over APG-Neuros's and KTurbo's Lanham Act claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Neuros's state-law claims pursuant to 278 U.S.C. § 1367 because those claims are so related to the claims arising under federal law as to form part of the same case or controversy.

### Defamation

Both parties cite to Illinois law in support of their defamation claims. A defendant is liable for defamation under Illinois law if it made a false statement about the plaintiff and published that statement to a third party without privilege. *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 726 (7th Cir. 2004) (*Republic Tobacco*) (citing *Krasinski v. United Parcel Serv., Inc.*, 530 N.E.2d 468, 471 (Ill. 1988)). A defamation action will not succeed if the defendants' statements are "substantially true." *Id.*; *Naleway v. Agnich*, 897 N.E.2d 902, 908 (Ill. App. Ct. 2008). A statement is "substantially true" if the "gist" or "sting" of it is true. *Bogosian v. Bd. of Educ. of Comty. Unit Sch. Dist. 200*, 134 F. Supp. 2d 952, 957 (N.D. Ill. 2001).

A conditional privilege for speech that could otherwise be defamatory has been found to exist under Illinois law where the following elements are present: "(1) good faith by the defendant in making the statement; (2) an interest or duty to uphold; (3) a statement limited in its scope to that purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only." *Kuwik v. Sarmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 133 (Ill. 1993) (*Kuwik*). Statements made in "reckless disregard" of the plaintiff's rights or with a "direct intent to injure" the plaintiff are not privileged. *Id.* 136-37. "Reckless disregard" has been defined as proceeding to publish the defamatory matter despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989) (citations omitted).

Illinois courts have recognized four categories of statements that are considered defamatory *per se*, including "words that impute the commission of a crime" and "words that prejudice a party, or impute lack of ability, in his or her trade, profession, or business." *Republic Tobacco*, 381 F.3d at 726 (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 206 (Ill. 1992) (*Kolegas*)). For claims of defamation *per se*, proof of actual damages is not required; injury is presumed. *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996). For other claims of defamation (i.e., defamation *per quod*), the plaintiff must prove that it sustained actual pecuniary damage. *Dubinski v. United Airlines*, 708 N.E.2d 441, 447 (Ill. 1999).

### Trade Libel/Commercial Disparagement

"[A]s the commentators have correctly observed, defamation and commercial disparagement are separate and distinct torts: a defamation action lies when the integrity or credit of a business has been impugned, but if the quality of the goods or services are demeaned, then an action for commercial disparagement may be proper." *Crinkley v. Dow Jones & Co.*, 385 N.E.2d 714, 720 (Ill. App. Ct. 1978) (citations omitted). To succeed on a claim for commercial disparagement, a plaintiff must show that the defendant made a false and demeaning statement regarding the quality of the plaintiff's goods or services. *Appraisers Coal. v. Appraisal Inst.*, 845 F. Supp. 592, 610 (N.D. Ill. 1994).

### False Advertising

In relevant part, section 43(a)(1) of the Lanham Act provides as follows:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

* * *

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

To prevail on a false-advertising claim under the Lanham Act, a plaintiff must prove the following: (1) a literally false statement of fact by the defendant; (2) in

commercial advertising or promotion about the plaintiff's products, services, or activities; (3) on a subject likely to influence a purchasing decision; (4) placed by the defendant into commerce subject to federal regulation; (5) that actually does or likely will injure the plaintiff's sales or goodwill. *Hotwax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999).

Although "commercial advertising or promotion" is not defined in the Lanham Act, the Seventh Circuit has held that section 43(a) addresses "promotional material disseminated to anonymous recipients." *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005) (quoting *First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 804 (7th Cir. 2001)). Advertising is "the action of calling something to the attention of the public"; and promotion refers to "the furtherance of the acceptance and sale of merchandise through advertising, publicity, or discounting." *Am. Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*, 820 F. Supp. 1072, 1078 (N.D. Ill. 1993); *see also Foboha GmbH v. Gram Tech., Inc.*, No. 08 C 969, 2008 WL 4619795, at *3 (N.D. Ill. Oct. 15, 2008) ("Direct communications, whether in person or by letter, are not commercial advertising or promotion as our Court of Appeals has defined those terms."); *Johnson Controls, Inc. v. Exide Corp.*, 152 F. Supp. 2d 1075, 1081-81 (N.D. Ill. 2001) ("[M]isrepresentations made to a single customer in the context of negotiating a transaction cannot constitute 'advertising' or 'promotion' in the statutory sense.").

*DTPA and ICFA*

DTPA claims are to be resolved according to principles set forth under the Lanham Act. *See Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D. Ill. 1994). Claims under the DTPA and ICFA "rise or fall" based on Lanham Act claims for the same conduct because the legal inquiries are the same under either cause of action. *MJ & Partners Restaurant Ltd. P'shp v. Zadikoff*, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998) (*MJ & Partners*).

## DECISION

### *APG-Neuros's Claims*

As discussed above, APG-Neuros proved that KTurbo published false statements accusing APG-Neuros of "cheating" and committing a "crime" by overstating its efficiency in connection with the South Valley project. There is no evidence that APG-Neuros guaranteed *any* total efficiency figure for the South Valley project, much less a purportedly impossible figure of 82.2%. And to the extent efficiency can be calculated from the data that APG-Neuros did provide to South Valley – a calculation that was never sufficiently explained at trial – the evidence does not support Lee's accusations that APG-Neuros overstated the capabilities of its blowers by 15%.

To prevail on its defamation claims, APG-Neuros must also prove that KTurbo's statements were not privileged. Lee's statements regarding his intent to "break" and "terminate" APG-Neuros show that his statements were not made in good faith. *Cf. Kuwik*, 619 N.E.2d at 136-37. Thus, KTurbo's statements were defamatory.

APG-Neuros did not offer any evidence of actual damages necessary to support a claim for defamation *per quod*, as claimed in Count IV of APG-Neuros's Complaint. Therefore, judgment is awarded in favor of KTurbo on Count IV.

However, APG-Neuros argues that KTurbo's statements were defamatory *per se*, as claimed in Count III of APG-Neuros's Complaint, because KTurbo accused APG-Neuros of committing a "crime" and of "cheating." For a statement to be defamatory *per se* under the crime exception, the charged offense must be indictable, involve moral turpitude, and be punishable by a term of imprisonment. *See Mitchell v. Peoria Journal-Star, Inc.*, 221 N.E.2d 516, 520 (Ill. App. Ct. 1966). Although Lee repeatedly used the word "crime" to describe what he believed to be APG-Neuros's misrepresentations, he did not accuse APG-Neuros of any particular crime.

By accusing APG-Neuros of cheating, however, KTurbo did convey words that prejudice APG-Neuros, or impute lack of ability, in APG-Neuros's business. *Cf. Kolegas*, 607 N.E.2d at 206 (holding that radio DJs' on-air statement that festival promoter was scamming listeners constituted defamation *per se* because it imputed a lack of integrity in the promoter's discharge of his employment duties and because it prejudices him in his business). To "cheat" is "to practice fraud or trickery" or "to violate rules dishonestly." Merriam-Webster's Collegiate Dictionary 210 (11th ed. 2003). KTurbo essentially accused APG-Neuros of fraudulently and dishonestly making false guarantees about the performance characteristics of its blowers in order to deceive customers and win public bids. Thus, KTurbo's statements are defamatory *per se*. Judgment is awarded in favor of APG-Neuros on Count III of its Complaint.

APG-Neuros argues that by accusing APG-Neuros of cheating as to the performance capabilities of its products, KTurbo also disparaged the products, themselves. As explained above, however, APG-Neuros offered no evidence of damages incurred as a result of KTurbo's statements. Thus, KTurbo's statements were not proven to be defamatory *per quod*. APG-Neuros succeeds on its claim for defamation only because APG-Neuros proved that KTurbo's statements were defamatory *per se* in that they convey words that prejudice APG-Neuros, or impute lack of ability, in APG-Neuros's business. That rationale does not apply to statements about APG-Neuros's *products*, and APG-Neuros cites no authority in support of a claimed action for commercial disparagement *per se*. APG-Neuros failed to prove its claim for trade libel/commercial disparagement. Judgment is awarded in favor of KTurbo on Count V of APG-Neuros's Complaint.

Unlike its defamation claim, which requires only that false statements be published to a third party, APG-Neuros's claim under the Lanham Act requires APG-Neuros to prove that KTurbo's statements were conveyed in "commercial advertising or promotion." With the exception of a couple of isolated emails or face-to-face conversations that postdate APG-Neuros's Complaint, KTurbo's false statements were contained in PowerPoint presentations that were (a) emailed to KTurbo's own representatives, (b) presented at a meeting for KTurbo's own representatives, and (c) posted on the non-public "salesnet" portion of KTurbo's website or the Korean-language version of its public website. Although APG-Neuros argues that KTurbo's *intent* was for those representatives to disseminate that information to the relevant public

or that KTurbo *encouraged* representatives to use Lee's materials, there was no evidence that any of them did so. Indeed, APG-Neuros has presented evidence that some of those KTurbo representatives expressed strong disagreement with Lee's tactics, which supports the contrary inference, i.e., that they were not so disseminated. What APG-Neuros characterizes as a "massive library of promotional materials," *see* Pl. Closing Argument Br. 6, consists almost entirely of direct correspondence and computer files used in face-to-face communications; and there is no evidence that the statements at issue were presented to any members of the general public. APG-Neuros's attempts to characterize KTurbo's comments as false advertising are unpersuasive. Because APG-Neuros has failed to prove that KTurbo's communications rise to the level of advertising or promotion, APG-Neuros failed to prove its Lanham Act claim. Judgment is awarded in favor of KTurbo on Count I of APG-Neuros's Complaint.

APG-Neuros cannot prevail on its DTPA claim for the same reason it loses on its Lanham Act claim. Claims under the DTPA "rise or fall" based on Lanham Act claims for the same conduct because the legal inquiries are the same under either cause of action. *See MJ & Partners*, 10 F. Supp. 2d at 929. Judgment is awarded in favor of KTurbo on Count II of APG-Neuros's Complaint.

APG-Neuros also alleged that KTurbo committed the common-law tort of intentional interference with prospective economic relations. However, APG-Neuros offered no evidence of damages and no arguments to support this claim at trial or in post-trial briefing. Judgment is awarded in favor of KTurbo on Count VI of APG-Neuros's Complaint.

KTurbo alleges that APG-Neuros made misrepresentations about its own products in bidding on the South Valley project and the Bowling Green project and that "[i]n or about September 2008 Neuros met with representatives of the Bowling Green, Kentucky wastewater project and made false, deceptive, and misleading statements about KTurbo, including statements that KTurbo was going out of business within six (6) months." Countercl. ¶¶ 8-11. Without reference to any particular WWTP project, KTurbo also alleges that APG-Neuros "disparaged KTurbo's goods, services, and business by false and/or misleading representations of fact." Countercl. ¶ 29. Finally, KTurbo alleges that it had a reasonable expectancy of supplying blowers to the South Valley and Bowling Green WWTP projects and a reasonable expectancy of "other potential valid business relationships with certain prospective customers who will potentially purchase KTurbo's products and otherwise do business with KTurbo." Countercl. ¶ 67.

Although KTurbo's counterclaims were based solely on alleged false statements about the South Valley and Bowling Green projects, KTurbo now claims that APG-Neuros made false and misleading statements of fact in connection with three projects that were not mentioned in KTurbo's counterclaims: KUB, Ironhouse, and Timpanogos.

Not only did KTurbo fail to make any allegations regarding those projects in its counterclaims, the conduct of which KTurbo now complains did not occur until *after* those counterclaims were filed. In a motion *in limine* filed before trial, APG-Neuros moved to exclude *all* evidence of the KUB, Ironhouse, and Timpanogos projects at trial

based on APG-Neuros's assertion that *any* use of such evidence was barred by an order entered by Magistrate Judge Valdez on February 9, 2010.[5] In response to APG-Neuros's motion, KTurbo argued that the scope of Judge Valdez's order was limited to excluding evidence of *damages* on those projects and that evidence regarding those projects was relevant to issues of, among other things, malice, unclean hands, and impeachment. The Court denied APG-Neuros's motion, holding that Judge Valdez's order was limited to the exclusion of evidence regarding damages and that KTurbo may move to admit the evidence on any other grounds at the time of trial. *See* Docket No. 216. KTurbo presented evidence regarding the KUB, Timpanogos, and Ironhouse projects at trial; and APG-Neuros did not object on the grounds that it was beyond the scope of KTurbo's counterclaims. Nor did APG-Neuros make any such objection in post-trial briefing. Issues tried by implied consent are treated as if they were raised in the pleadings. *See* Fed. R. Civ. P. 15(b)(2).[6] Accordingly, each of KTurbo's counterclaims will be evaluated on the merits as if they included allegations as to the KUB, Ironhouse, and Timpanogos projects.

KTurbo's Lanham Act claim fails for the same reason as APG-Neuros's Lanham Act claim. There is no evidence that any alleged false statements were part of

---

[5] Although KTurbo's counterclaims also contained no allegations about the King County project, KTurbo timely disclosed alleged damages in relation to that project in the course of discovery. Accordingly, evidence of those damages was not excluded by Judge Valdez's order.

[6] "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue." Fed. R. Civ. P. 15(b)(2).

any commercial advertising or promotion. APG-Neuros's power-draw guarantees for the South Valley project were submitted to South Valley in response to a bid request. The statements in the CH2M Hill report were made by CH2M Hill, and there is no evidence that APG-Neuros was using that report for advertising purposes. To the extent APG-Neuros disseminated any of the Napa reports to anyone, there is no evidence that anyone at APG-Neuros provided those reports except at the request of specific customers. The only other evidence regarding statements made about APG-Neuros's or KTurbo's products pertains to private correspondence with individuals. There is no evidence to show that APG-Neuros widely distributed any allegedly false statements. Thus, KTurbo failed to prove its false-advertising claim. Judgment is awarded in favor of APG-Neuros on KTurbo's first counterclaim.

As discussed above, KTurbo also failed to prove that APG-Neuros made any false statements about KTurbo or its finances. Thus, KTurbo's claims for defamation, commercial disparagement, and violations of the DTPA fail. KTurbo's ICFA claim also fails because, like claims brought under the DTPA, claims brought under the ICFA "rise or fall" with Lanham Act claims. *See MJ & Partners*, 10 F. Supp. 2d at 929. Judgment is awarded in favor of APG-Neuros on KTurbo's second, third, fourth, fifth, and sixth counterclaims.

KTurbo also claims that APG-Neuros intentionally interfered with KTurbo's prospective economic relations. Proof of this claim requires proof of damages. *See Bank Computer Network Corp. v. Cont'l Ill. Nat'l Bank*, 332 N.E.2d 586, 592 (Ill. App. Ct. 1982). As discussed above, KTurbo was barred from presenting any evidence of

compensatory damages other than "lost profits from" and "the value of time and labor that would have been associated with" the South Valley, Bowling Green, and King County WWTP projects. *See* Docket No. 216, at 2. Accordingly, KTurbo's claim cannot be based on any alleged loss of the KUB, Timpanogos, or Ironhouse projects.

Mere hope for a prospective economic relationship is not a reasonable expectancy. *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996). With regard to the Bowling Green project, there is no evidence that KTurbo even submitted a bid, much less any evidence that APG-Neuros caused KTurbo to lose such a bid. Regarding the King County project, the evidence shows that APG-Neuros was awarded a contract through a process that did not involve open bidding. Thus, there is no evidence that KTurbo had any reasonable expectation that it would be awarded a contract on that project. Finally, with regard to the South Valley project, the evidence shows that KTurbo finished third out of three bidders. Thus, even if APG-Neuros had made false statements about its own blowers, KTurbo still would not have submitted the winning bid.

Because KTurbo did not prove that APG-Neuros caused KTurbo to incur any damages, KTurbo failed to prove its claim for intentional interference with prospective economic relations. Judgment is awarded in favor of APG-Neuros on KTurbo's seventh counterclaim.

### Damages

As explained above, of all the claims submitted by APG-Neuros and KTurbo, only one was successfully proven at trial: APG-Neuros's claim for defamation *per se*. KTurbo falsely published statements to the effect that APG-Neuros cheated in the

South Valley bid process by overstating the guaranteed efficiency of its turbo blowers. However, APG-Neuros did not offer any evidence as to actual damages suffered as a result of KTurbo's false statements. Instead, APG-Neuros asserts that it is entitled to presumed general damages.

When a statement is defamatory *per se*, a plaintiff can recover "presumed damages," or "general damages," without proving special damages. *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1138 (7th Cir. 1987) (*Brown & Williamson*). Presumed damages are "an estimate, however rough, of the probable extent of actual loss a person had suffered and would suffer in the future, even though the loss could not be identified in terms of advantageous relationships lost, either from a monetary or enjoyment-of-life standpoint." *Id.* (quoting *Prosser and Keeton on Torts*, § 116A at 843). The award may not be "substantial." *Id.* at 1142. With very little discussion and factual support as to how to arrive at an appropriate amount, APG-Neuros nonetheless argues that "a substantial award" of $1 million is appropriate in this case. *See* Pl. Closing Argument Br. 11.

APG-Neuros purports to justify its request by citing to two cases that awarded $1 million in presumed general damages. *Brown & Williamson* involved a libel suit brought by a cigarette manufacturer against a Chicago television newscaster and network who aired a broadcast in which the newscaster accused the plaintiff of using drugs, sex, and alcohol as a strategy to encourage young persons to smoke. *Id.* at 1142. A jury awarded $3 million in compensatory damages, but the district court reduced the award to $1 after trial. *Id.* at 1121-22. On appeal, the Seventh Circuit reinstated $1 million of the

$3 million award. The issue of damages had been tried separately from the issue of liability, and the jury was presented with "a variety of evidence that [the plaintiff's] reputation had been harmed by [the defendant's] statement." *Id.* at 1138-39. The defamatory statements were watched by over 2.5 million people on Chicago's most popular news network. *Id.* at 1142. Although it recognized that determining presumed damages was "a very inexact and somewhat arbitrary process," the Seventh Circuit determined that $1 million was a proper award. *Id.*

APG-Neuros also cites *Republic Tobacco*, a case involving a dispute between two competing manufacturers of cigarette papers: North Atlantic Trading Company ("North Atlantic") and Republic Tobacco Company ("Republic"). North Atlantic sued Republic for alleged antitrust violations, and Republic countersued for defamation. *See Republic Tobacco*, 381 F.3d at 721. The defamation claim concerned statements made in two letters. *Id.* at 723. The first letter was written by a North Atlantic regional manager to a buyer at one of the largest convenience-store operators in the Midwest. *Id.* The letter falsely stated that North Atlantic held patent and trademark rights that were being violated by Republic and that North Atlantic had initiated legal action to protect those rights. *Id.* After North Atlantic sent the letter, Republic lost its exclusive relationship with that customer. *Id.* The second letter was addressed to all of North Atlantic's customers (many of whom were also Republic's customers) and explained that North Atlantic had filed a lawsuit charging Republic with unfair competition, deceptive trade practices, and antitrust violations. *Id.* at 723-24.

The only claim to survive summary judgment was Republic's defamation claim, on which Republic ultimately prevailed. *Id.* at 721-22. The issue of damages was then tried to a jury, and the jury returned a verdict of $8.4 million in presumed general compensatory damages, plus punitive damages. *Id.* at 722. On a motion for remitter, the district court reduced that award to $3.36 million. *Id.* With little discussion, the Seventh Circuit held that the district court abused its discretion and further reduced the award to $1 million. *Id.* at 734. The court held that "[a]n award of $1 million is sizeable enough to compensate Republic for the damage that we presume was caused to its reputation in the tobacco industry and the harm that we presume was done to the business relationships it cultivated over the years, yet not so substantial as to be out of line with other presumed-damages awards allowed under Illinois law." *Id.* at 734-35.

Both of the aforementioned cases involved conduct that was proven to be damaging to the reputation of the subjects of the defamatory statements – indeed, the issue of damages was tried separately in both cases. General damages were awarded because it was impossible to quantify that harm. Here, APG-Neuros did not present *any* evidence of damages or harm to its reputation. There is no evidence of lost profits, lost opportunities, or lost customers. Although some harm can be presumed, the Court cannot presume damages approaching those awarded in *Brown & Williamson* or *Republic Tobacco* and finds that an award of $1 million would be impermissibly substantial. Instead, the Court awards $10,000 to compensate APG-Neuros for the presumed damage to its reputation in the WWTP industry and the value of any resources it may have been required to expend to counteract any unspecified damages to its

reputation caused by KTurbo's statements. It should be noted that APG-Neuros brought six claims against KTurbo and only prevailed on one. At any rate, APG-Neuros has not provided the Court with any useful data to arrive at a higher figure.

APG-Neuros also requests an award of punitive damages. Under Illinois law, "[p]unitive damages are awarded when torts are committed with fraud [or] actual malice, . . . or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998) (citation and internal quotation marks omitted).[7] The most important consideration in determining a reasonable award of punitive damages is "the degree of reprehensibility of the defendant's conduct." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996) (*BMW*)). Among other things, courts awarding punitive damages should consider whether the conduct involved repeated actions and whether it was the result of intentional malice or deceit. *Id.* (citing *BMW*, 517 U.S. at 576-77). There is a presumption that a defendant is made whole by compensatory damages; and "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.* (citing *BMW*, 517 U.S. at 575).

---

[7] *See also Illinois Pattern Jury Instructions – Civil* (2006) (providing that the amount of punitive damages should be determined after considering the reprehensibility of the defendant's conduct, the actual and potential harm that conduct caused to the plaintiff, and the amount of money necessary to punish the defendant and discourage the defendant and others from future wrongful conduct).

As does its request for presumed damages, APG-Neuros's request for punitive damages lacks sufficient support in the record. APG-Neuros simply asserts that "a substantial punitive award is necessary" to deter KTurbo's "willful and malicious conduct" and that $1 million is an appropriate figure. *See* Pl. Closing Argument 12-13. There is no evidence as to KTurbo's assets or corporate profits, no significant citation or discussion of punitive-damage awards in comparative cases, and nothing to otherwise explain why $1 million is the appropriate measure of punishment for KTurbo in this particular case.

To be sure, some measure of punishment is appropriate. KTurbo published false statements about APG-Neuros; expressly stated its intent to "break" and "terminate" APG-Neuros; and continued to accuse APG-Neuros of cheating after its representatives advised it not to do so, after receiving a cease-and-desist letter, and after the initiation of this lawsuit. Punitive damages are warranted in the amount of $50,000.

APG-Neuros also seeks injunctive relief and an award of attorney's fees. Neither is warranted. APG-Neuros's request for injunctive relief is tied to claims on which APG-Neuros did not succeed, and APG-Neuros cites no authority for an award of attorney's fees in a defamation action.

## CONCLUSION

For the reasons stated above, judgment is awarded in favor of APG-Neuros and against KTurbo on APG-Neuros's claim for defamation *per se*. APG-Neuros is awarded compensatory damages in the amount of ten thousand dollars ($10,000) and punitive damages in the amount of fifty thousand dollars ($50,000). Judgment is awarded in favor

of KTurbo on APG-Neuros's remaining claims, and judgment is awarded in favor of

APG-Neuros on all of KTurbo's counterclaims.

Date: _May 3, 2011_                            

JOHN W. DARRAH
United States District Court Judge